United States District Court
Southern District of Texas

**ENTERED**

April 12, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LNG AMERICAS, INC.,                 §
                                    §
            Plaintiff,              §
                                    §
v.                                  §      CIVIL ACTION NO. H-21-2226
                                    §
CHEVRON NATURAL GAS, a division     §
of Chevron U.S.A. Inc.,             §
                                    §
            Defendant.              §

## MEMORANDUM OPINION AND ORDER

LNG Americas., Inc., formerly Cailip Gas Marketing, LLC, ("Plaintiff") brought this breach-of-contract action against Chevron Natural Gas, a division of Chevron U.S.A., Inc. ("Defendant").[1] Plaintiff contracted with Defendant to deliver a fixed amount of natural gas each day.[2] During February of 2021 Defendant did not deliver the full amounts of natural gas stated in

---

[1]Plaintiff's Original Complaint ("Complaint"), Docket Entry No. 1, pp. 1-2 ¶ 1; Order Granting Plaintiff's Unopposed Motion to Substitute Party and Correct Docket, Docket Entry No. 40. For purposes of identification, all page numbers refer to the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

[2]Transaction Confirmation, Exhibit 2 to Plaintiff Cailip Gas Marketing, LLC's Traditional Motion for Summary Judgment ("Plaintiff's MSJ", Docket Entry No. 37), Docket Entry No. 38, p. 19; Transaction Confirmation, Exhibit 3 to Plaintiff's MSJ, Docket Entry No. 38, p. 22.

the contract.[3]  Plaintiff now sues for damages.[4]  Defendant asserts

that the contract's force majeure terms excused its performance.[5]

Plaintiff disagrees.[6]  The court now addresses the parties' pending

summary judgment motions:  Plaintiff's MSJ (Docket Entry No. 37)

and Chevron Natural Gas's Motion for Summary Judgment ("Defendant's

MSJ") (Docket Entry No. 39).   For the reasons stated below,

Plaintiff's MSJ will be denied, Defendant's MSJ will be granted,

and this action will be dismissed with prejudice.

## I.  Background

In December of 2018 the parties entered into the Base Contract

for Sale and Purchase of Natural Gas ("Base Contract").[7]  They used

a form contract developed by the North American Energy Standards

Board (NAESB) for natural gas sales.[8]  The Base Contract provides

terms to govern subsequent natural gas sales, although it does not

---

[3]Chevron Natural Gas's Response to LNG Americas, Inc.'s Motion for Summary Judgment ("Defendant's Response"), Docket Entry No. 41, p. 11.

[4]Complaint, Docket Entry No. 1, p. 7 ¶ 20.

[5]Defendant Chevron Natural Gas's Original Answer, Docket Entry No. 10, p. 3 ¶ 1.

[6]Plaintiff's MSJ, Docket Entry No. 37, p. 6 ("Chevron argues that it lost production during Winter Storm Uri and that it was therefore excused from making the full deliveries. It was not.").

[7]Base Contract, Exhibit 1 to Plaintiff's MSJ, Docket Entry No. 38, p. 4.

[8]Plaintiff's MSJ, Docket Entry No. 37, p. 9.

obligate them to enter any sales.[9]  The Base Contract states that
the parties may later enter "Transaction Confirmations," which
together with the Base Contract, form agreements for the sale of
natural gas.[10]  The parties entered two Transaction Confirmations,
which   together   with   the   Base   Contract   form   an   agreement
(collectively, "the Contracts") obligating Defendant to deliver
90,000 million British Thermal Units ("MMbtus") of natural gas each
day to Plaintiff.  Defendant was to make the deliveries at the Katy
Oasis delivery point in Katy, Texas.[11]  The Katy Oasis is a delivery
point on the Oasis Pipeline, which transports natural gas from the
Permian Basin.[12]  For any day that Defendant does not deliver 90,000
MMbtus of gas to Plaintiff at the Katy Oasis, the contract entitles
Plaintiff to damages.[13]  The parties agreed to a damages formula:
Plaintiff is entitled to the difference between the "spot price"
and   the   contract   price,   multiplied   by   the   volume   of   missed

---

[9]Id.

[10]Base Contract, Exhibit 1 to Plaintiff's MSJ, Docket Entry
No. 38, p. 5 § 1.2.

[11]Transaction Confirmation, Exhibit 2 to Plaintiff's MSJ,
Docket Entry 38, p. 19; Transaction Confirmation, Exhibit 3 to
Plaintiff's MSJ, Docket Entry 38, p. 22.

[12]Expert Report of Lesa S. Adair ("Adair Report"), Exhibit A-6
to Defendant's MSJ, Docket Entry No. 39-7, p. 32 ¶ 49 & Figure 19.

[13]Base Contract, Exhibit 1 to Plaintiff's MSJ, Docket Entry
No. 38, p. 4 (selecting Spot Price Standard and selecting reference
publication), p. 7 § 3.2 (describing Spot Price Standard).

deliveries.[14]  The spot price is determined by reference to the Gas Daily Midpoint publication.[15]  The Base Contract includes a force majeure provision:

> [N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure.  The term "Force Majeure" . . . means any cause not reasonably within the control of the party claiming suspension . . . includ[ing], but not limited to, the following:  (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes . . . floods, washouts . . . (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe . . . and (v) governmental action such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction.  Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.  Neither party shall be entitled to the [Force Majeure provision] to the extent performance is affected by any or all of the following circumstances:  . . . (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch . . . [16]

The parties agreed to three "special conditions" in the Transaction Confirmations, two of which affect the force majeure scope.[17] Special Condition Number 2 states:

---

[14] Id.

[15] Id.

[16] Id. at 11 §§ 11.1, 11.2, 11.3 (emphasis added).

[17] Transaction Confirmation, Exhibit 2 to Plaintiff's MSJ, Docket Entry 38, p. 19; Transaction Confirmation, Exhibit 3 to Plaintiff's MSJ, Docket Entry 38, p. 22.

> Notwithstanding anything to the contrary in the Base
> Contract or elsewhere, and for avoidance of doubt,
> <u>Seller's delivery obligations under this Transaction
> Confirmation shall not be excused by a loss of, or
> fluctuations in, production from any particular Seller's
> gas producing region or wellhead.</u>[18]

Special Condition Number 3 states:

> [The Force Majeure definition] of the Base Contract is
> hereby amended . . . by inserting the following language
> immediately following the phrase "having jurisdiction":
> "; provided, however, that any of the previously
> described <u>events or circumstances shall only constitute
> Force Majeure if and to the extent that such event or
> circumstance directly prevents or restricts delivery</u> by
> Seller or receipt by Buyer of Gas at the applicable
> Delivery Point."[19]

In mid-February of 2021 Winter Storm Uri brought a sustained period of abnormally low temperatures to most of Texas, including the Permian Basin where Defendant extracts natural gas for transport on the Oasis Pipeline.[20]  Defendant delivered less than the required 90,000 MMbtus from February 14, 2021, through February 22, 2021.[21]  On February 15, 2021, Defendant notified Plaintiff that it had declared Force Majeure.[22]  Defendant stated

---

[18]<u>Id.</u> (emphasis added).

[19]<u>Id.</u> (emphasis added).

[20]See Adair Report, Exhibit A-6 to Defendant's MSJ, Docket Entry No. 39-7, p. 13 Figure 5, p. 29, Figure 16.

[21]Exhibit 8 to Plaintiff LNG Americas, Inc.'s Response to Chevron Natural Gas's Motion for Summary Judgment ("Plaintiff's Response," Docket Entry No. 42), Docket Entry No. 42-9, p. 2.

[22]Notice of Force Majeure, Exhibit 5 to Plaintiff's MSJ, Docket
(continued...)

that Plaintiff would be "receiving less than the nominated quantity
of gas," citing "unprecedented low temperatures causing freezing or
failure of wells, plants or lines of pipe."[23]  The gas shortage at
the Katy Oasis was caused by Defendant's reduced production, not
any transport problems on the Oasis Pipeline or at the Katy Oasis
delivery point.[24]  The parties also appear to agree that 628,913
MMbtus were not delivered as a result of Uri.[25]  However, Plaintiff
declined some available gas on February 21.[26]  On April 27, 2021,
Plaintiff notified Defendant that it disputed the force majeure
declaration and sent an invoice for damages.[27]

Defendant did not pay the claimed damages, and Plaintiff filed

---

[22](...continued)
Entry No. 38, p. 28.

[23]Id.

[24]Declaration of Michael Powers, Exhibit B to Defendant's
Response, Docket Entry No. 41-33, pp. 3-4 ¶ 7. Even though
Plaintiff argues that Defendant wrongly delivered gas to other
customers, Plaintiff's briefing does not dispute that Defendant's
lost production caused its total supply at the Katy Oasis to fall
short of its total obligations.

[25]Correspondence In Re: Chevron Natural Gas February 15, 2021
Notice of Force Majeure ("Defendant's Force Majeure Rejection"),
Exhibit 7 to Plaintiff's MSJ, Docket Entry No. 38, p. 34 (summing
cuts from February 14-22); Defendant's Response, Docket Entry
No. 41, p. 11.

[26]ICE Chat Felix Chevron, Exhibit A-19 to Defendant's Response,
Docket Entry No. 41-20, p. 6 (2/21/2021 7:16-7:17).

[27]Defendant's Force Majeure Rejection, Exhibit 7 to Plaintiff's
MSJ, Docket Entry No. 38, p. 35.

this action on July 9, 2021.[28]  The Complaint alleges that Defendant breached the Contracts by not delivering the gas and that force majeure did not excuse Defendant's performance.  The discovery period closed on September 16, 2022.[29]  The parties filed their competing Motions for Summary Judgment on January 26, 2023, and each responded on February 16, 2023.[30]  The parties mutually agreed to not file replies.[31]

## II.  Legal Standard

### A.  Texas Contract Law

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."  Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).  "We also give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense."  Plains Exploration & Production Co. v. Torch Energy Advisors Inc., 473 S.W.3d 296, 305 (Tex. 2015).  "[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered

---

[28]Complaint, Docket Entry No. 1.

[29]Amended Docket Control Order, Docket Entry No. 29, p. 2 ¶ 6.

[30]Plaintiff's MSJ, Docket Entry No. 37; Defendant's MSJ, Docket Entry No. 39; Defendant's Response, Docket Entry No. 41; Plaintiff's Response, Docket Entry No. 42.

[31]Notice of Agreed Summary Judgment Briefing Schedule, Docket Entry No. 34, p. 1.

meaningless." Coker, 650 S.W.2d at 393. However, "redundancies may be used for clarity, emphasis, or both." Philadelphia Indemnity Insurance Co. v. White, 490 S.W.3d 468, 477 (Tex. 2016).

## B. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact is or is not genuinely disputed must support the assertion by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). "[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 2554. "'In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment.'" Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004); see also Coker, 650 S.W.2d at 394.

## III. Analysis

-8-

## A.    Force Majeure

Defendant asserts that the missed deliveries are excused under the contract's force majeure terms.[32]   Plaintiff responds that Special Conditions 2 and 3 make clear that Defendant may not declare force majeure based on a loss-of-production event.[33] Plaintiff also argues that Special Condition 3 precluded force majeure because Uri did not prevent Defendant from purchasing and delivering replacement gas.[34]   Defendant argues that Plaintiff's readings are unnatural and would make much of Special Condition 2 superfluous.

"The scope and effect of a 'force majeure' clause depends on the specific contract language, and not on any traditional definition of the term." Virginia Power Energy Marketing, Inc. v. Apache Corp., 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009).  A court should therefore "strictly construe a force majeure clause according to its terms." MRC Permian Co. v. Point Energy Partners Permian LLC, 624 S.W.3d 643, 657 (Tex. App.—El Paso 2021). "The party seeking to excuse its performance under a contractual force majeure clause . . . bears the burden of proof to establish that defense." Virginia Power, 297 S.W.3d at 402.

---

[32]Defendant's MSJ, Docket Entry No. 39, p. 24.

[33]See Plaintiff's MSJ, Docket Entry No. 37, p. 16 ("The plain language of the Special Conditions negates Chevron's Force Majeure defense.").

[34]Plaintiff's Response, Docket Entry No. 42, p. 22.

The parties' dispute centers on the effect of Special Conditions 2 and 3. These Special Conditions are apparently unique to the parties' contract; and, for the most part, the parties have not cited cases interpreting similar terms. The court therefore interprets the language of these terms according to their ordinary meaning, including dictionary definitions. See Sunstate Equipment Co., LLC v. Hegar, 601 S.W.3d 685, 697 (Tex. 2020) ("'We consult dictionaries to discern the natural meaning of a common-usage term not defined by contract, statute, or regulation.'").

### 1.   The Base Contract's Force Majeure Language

There is no dispute that under the Base Contract, Defendant could have declared force majeure during Uri. The Base Contract's list of Force Majeure events includes "(ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failures of wells or lines of pipe."[35] Plaintiff makes no argument that Uri would not be a force majeure under the Base Contract's language. Plaintiff's employee who negotiated the Contracts agreed that Uri would have qualified as a force majeure under the Base Contract.[36]

### 2.   Special Condition 2

---

[35]Base Contract, Exhibit 1 to Plaintiff's MSJ, Docket Entry No. 38, p. 11 § 11.2.

[36]Oral Deposition of Gary Hanks, Exhibit A-4 to Plaintiff's MSJ, Docket Entry No. 39-5, p. 11 (90:6-15).

-10-

Special Condition 2 states that delivery "shall not be excused by a loss of, or fluctuations in, production from <u>any particular</u> Seller's gas producing region or wellhead." (emphasis added).[37] Plaintiff argues that this denies Defendant any right to declare force majeure based on any amount of lost production.[38]  Defendant argues that Special Condition 2 only applies to loss-of-production events that are confined to a single region or wellhead.[39]   In short, Defendant emphasizes the word "particular,"[40] and Plaintiff emphasizes the word "any."[41]

Defendant cites Merriam-Webster's definition of "particular": "of, relating to, or being a <u>single</u> person or thing."[42]  Defendant argues that Special Condition 2 therefore means it "could not rely

---

[37]Transaction Confirmation, Exhibit 2 to Plaintiff's MSJ, Docket Entry 38, p. 19; Transaction Confirmation, Exhibit 3 to Plaintiff's MSJ, Docket Entry 38, p. 22.

[38]Plaintiff's MSJ, Docket Entry No. 37, p. 17 (Under Special Condition No. 2, "[l]oss of production from any region thus does not excuse performance").

[39]Defendant's MSJ, Docket Entry No. 39, p. 14 ("Uri did not impact [Defendant]'s production from just *any particular region or wellhead*; it restricted production from all three regions in the Permian Basin from which [Defendant] delivered gas to [Plaintiff].").

[40]<u>Id.</u> at 17 ("Uri . . . did not impact only a 'particular producing region' under any rational reading of that term.").

[41]Plaintiff's MSJ, Docket Entry No. 37, p. 18 ("Chevron's narrow focus on the term 'particular' fails because it ignores the immediately preceding broad term 'any.'").

[42]"Particular," Merriam-Webster, www.merriam-webster.com/ dictionary/particular (last visited March 27, 2023) (emphasis added).

-11-

merely on the loss of production from a single wellhead or a single region."[43] Plaintiff argues that Defendant ignores the breadth added by the preceding word "any."[44] Merriam-Webster's defines "any" as: "every -> used to indicate one selected without restriction."[45] The Supreme Court has stated that "any" "implies every member of the class or group." SAS Institute, Inc. v. Iancu, 138 S. Ct. 1348, 1354 (2018). These citations are helpful, but the court must interpret the phrase "any particular" as a whole—not the isolated meanings of "any" and "particular." The court concludes that Plaintiff's reading is flawed because it ignores the singular connotation of "particular." Plaintiff would have the court interpret "any particular" to have the same meaning as "any": "all" or "every."[46] This reading would eliminate any meaning for "particular," a result that courts avoid. See Coker, 650 S.W.2d at 393. In fact, Plaintiff's reading would require the entire phrase "from any particular Seller's gas producing region or wellhead" to be superfluous.[47] Plaintiff's expert acknowledged this:

---

[43]Defendant's Response, Docket Entry No. 41, p. 15.

[44]Plaintiff's MSJ, Docket Entry No. 37, p. 18.

[45]"Any," Merriam-Webster, www.merriam-webster.com/dictionary/any (last visited March 27, 2023).

[46]Plaintiff's MSJ, Docket Entry No. 37, p. 18.

[47]Defendant illustrates how Special Condition 2 would look without that phrase:

> Notwithstanding anything to the contrary in the NAESB or elsewhere, and for avoidance of doubt, Seller's delivery obligations under this Transaction Confirmation shall not

-12-

```
Q:    Okay. So, in your world, you think that this
      Special Condition No. 2, really, it could just say,
      "Shall not be excused by loss of, or fluctuations
      in, production," period, right?

A:    Probably could, yes.

Q:    In fact, that'd be clearer, wouldn't it?

A:    I don't think it's different.

Q:    That's not my question.· You agree it would be
      clearer if we just put a period after "production";
      we wouldn't be talking about what "any particular"
      means?
A:    Yeah, you could probably change the wording and
      say, "Loss of, or fluctuation in, any of its
      production," period, and make that clearer.⁴⁸
```

Even if the Special Condition 2 were ambiguous, the court's reading is reinforced by extrinsic evidence of the parties' negotiations.  When a contract is ambiguous, relevant extrinsic evidence of contract negotiations is admissible to help remove the ambiguity.  See Quiroz ex rel. Quiroz v. Covenant Health System, 234 S.W.3d 74, 85 (Tex. App.—El Paso 2007).  Defendants cite evidence that it rejected language requested by Plaintiff that would have explicitly prohibited any force majeure declaration based on loss of production.  Section 11.3 of the NAESB form

---

be excused by loss of, or fluctuation in, production ~~from any particular Seller's gas-producing region or wellhead~~.

Defendant's MSJ, Docket Entry No. 39, p. 16.

⁴⁸Oral Deposition of Robert L. Beck, Exhibit A-23 to Defendant's MSJ, Docket Entry No. 39-24, p. 6 lines 19-25, p. 7 lines 1-6.

contract states:

> Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by . . . <u>(v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.</u>[49]

Section 11.2 lists qualifying Force Majeure events. During negotiations, Plaintiff sent Defendant a draft version of the Base Contract that proposed replacing the above underlined language with the following underlined language:

> Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by . . . <u>(v) the loss or failure of Seller's Gas supply, including, without limitation, depletion of reserves or other failure of production . . . .</u>[50]

The proposed change would have removed the limitation: "except . . . as provided in Section 11.2." The effect of these changes would have been to unequivocally eliminate every loss-of-production event as a valid force majeure. These changes were not accepted by Defendant, and the parties instead agreed to Special Condition 2. The court is persuaded that Defendant rejected a term that would have redefined force majeure to exclude all loss-of-production events. Therefore, even if Special Condition 2 were ambiguous, the ambiguity would be removed by the fact that Plaintiff likely knew that Defendant did not share the meaning now urged by Plaintiff.

---

[49]Base Contract, Exhibit 1 to Plaintiff's MSJ, Docket Entry No. 38, p. 11 § 11.3 (emphasis added).

[50]Correspondence, Exhibit A-2 to Defendant's Response, Docket Entry No. 41-3, pp. 2, 6 ¶ 12 (emphasis added).

3.   <u>Special Condition 3 and Loss of Production</u>

Under Special Condition 3, an event can only be a force majeure "to the extent that [it] directly prevents or restricts delivery . . . at the applicable Delivery Point."[51]  Citing this language, Plaintiff alleges that "as long as gas is flowing at the Katy Oasis delivery point, the Force Majeure provision does not apply."[52]  Because "the Katy Oasis delivery point was operational during the relevant time period without interruption," Plaintiff alleges that Uri was not a valid force majeure.[53]

Merriam-Webster's defines "delivery" as "the act or manner of [handing over] something."[54]   Other language in the contract confirms that "delivery" refers to the "handing over" of the gas and not the broader chain of gas extraction and transport.  For example, Special Condition 3 uses the phrase "delivery . . . at the applicable Delivery Point," implying that delivery occurs at a single location, not throughout the supply chain.  Moreover, the parties had alternatives if they wanted to refer to the whole

---

[51]Transaction Confirmation, Exhibit 2 to Plaintiff's MSJ, Docket Entry 38, p. 19.

[52]Complaint, Docket Entry No. 1, p. 6 ¶ 16.

[53]<u>Id.</u> ¶ 17.

[54]Combining    "Delivery,"    Merriam-Webster, www.merriam-webster.com/ dictionary/delivery (last visited March 27, 2023) ("the act or manner of delivering something") <u>with</u> "Deliver," Merriam-Webster, www.merriam-webster.com/dictionary/deliver (last visited March 27, 2023) ("to take and hand over to or leave for another").

process of extracting and supplying gas.  They could have listed "production, transport, or delivery" or used a more general term like "performance."

Winter Storm Uri "prevent[ed] or restrict[ed] delivery" in that Defendant produced less gas to send on the Oasis Pipeline and ultimately to deliver at the Katy Oasis Delivery Point.  But Special Condition 3 limits "Force Majeure" to events that "directly" do so. One definition of "direct" is "stemming immediately from a source."[55] Under that meaning, an event "directly" prevents or restricts delivery if it interferes with the act of delivery itself.

Defendant argues that Special Condition 3 only excludes an event if it "merely triggered a series of events that may eventually and indirectly impact delivery."[56]  This reading is more in line with another Merriam-Webster's definition of "direct": "characterized by a close logical, causal, or consequential relationship."[57]  The causal chain from frozen wells to a Katy Oasis shortage is short and obvious:  less gas out of the ground means less gas in the pipeline, which means less gas available at the delivery point.  Based on this definition of "direct," the court concludes that Defendant's reading of Special Condition 3 is

---

[55]"Direct,"      Merriam-Webster,      www.merriam-webster.com/ dictionary/ direct (last visited March 27, 2023).

[56]Defendant's MSJ, Docket Entry No. 39, p. 18.

[57]"Direct,"      Merriam-Webster,      www.merriam-webster.com/ dictionary/ direct (last visited March 27, 2023).

plausible.

Defendant also argues that Plaintiff's reading of Special Condition 3 is not plausible for two reasons.  First, Defendant argues that to achieve Plaintiff's reading, "[t]he parties would have needed additional language stating that preventing or restricting delivery means that the Delivery Point is not operational or that the operator of the Delivery Point has declared force majeure."[58]  But the fact that a contractual result could have been achieved with more specific language does not cast doubt on that reading.  See Riverwalk Seafood Grill Inc. v. Travelers Casualty Insurance Co. of America, No. 20 C 3768, 2021 WL 81659, at *3 (N.D. Ill. Jan. 7, 2021) (rejecting such an argument because "language could always be more specific").

Defendant's stronger argument is that a broad reading would make Special Condition 2 superfluous.  Defendant argues that for Special Condition 2 to have any effect, Special Condition 3 cannot be read to prohibit all force majeure declarations based on loss of production.  This argument carries some force.  As stated above, Special Condition 2 narrows force majeure by excluding some loss-of-production events, i.e., those that are confined to a single region or wellhead.  But Plaintiff reads Special Condition 3 as limiting force majeure to events affecting operations at Katy Oasis itself.  Major loss-of-production events that occurred many miles

_____

[58]Defendant's Response, Docket Entry No. 41, p. 19.

upstream from the Katy Oasis would therefore be excluded by Special Condition 3.   Every force majeure excluded by Special Condition 2 would also be excluded by Special Condition 3.   Because Plaintiff's reading would make Special Condition 2 meaningless, the court concludes that Defendant's reading is the only plausible one.   See Coker, 650 S.W.2d at 393 (courts should "give effect to all the provisions of the contract so that none will be rendered meaningless").   Special Condition 3 does not define force majeure to exclude loss-of-production events.   Instead, it specifies that force majeure excludes events with only an indirect or attenuated impact on delivery.

4.   Special Condition 3 and Replacement Gas

Plaintiff also argues that Special Condition 3 precluded the force majeure declaration because Defendant was not prevented from purchasing and delivering replacement gas at Katy Oasis.   This argument has three logical components.   First, Plaintiff argues that the Contracts do not limit "gas" to Defendant's own production.[59]   Second, Plaintiff implies that delivery is only "prevented or restricted" to the extent Defendant is not "able" to deliver gas.[60]   Third, Plaintiff argues that Defendant was able to

---

[59]Plaintiff's Response, Docket Entry No. 42, p. 22 ("Chevron can satisfy its delivery obligation to Cailip with gas other than its own supply.").

[60]Id. at 26 ("[T]he operative question for Special Condition No. 3 is whether Chevron was able to deliver Gas, as defined in the Base Contract, at the Delivery Point.").

obtain more gas for Plaintiff on the spot market.[61]   Putting these together, Plaintiff argues that Defendant was able to purchase replacement gas and deliver it at Katy Oasis, making Special Condition 3 applicable.   Defendant responds that this reading is contrary to precedent and violates the Contracts' plain meaning.

The court addresses the second element of Plaintiff's argument below, deciding whether Special Condition 3 limits force majeure to include only events that make performance impossible.   Concluding that Special Condition 3 also allows for force majeure events that make performance impracticable, the court then addresses whether it was impracticable for Defendant to fill its obligations by purchasing replacement gas.

i.   Impossibility versus Impracticability

Plaintiff argues that Special Condition 3 hinges on whether Plaintiff was "able" to deliver the required gas.   Defendant counters that delivery does not have to become literally impossible to excuse performance.   In a recent, similar case examining very similar NAESB force majeure language, a court declined to read the phrase "prevents one party from performing" as requiring impossibility.   See MIECO LLC v. Pioneer Natural Resources USA, Inc., Civil Action No. 3:21-CV-1781-B, 2023 WL 2064723, at *1 (N.D.

---

[61]Id. at 22-23.   Plaintiff also argues that Defendant was not "prevented" from delivering some of its own gas to Plaintiff, namely the gas that Defendant delivered to other customers at Katy Oasis.   The court addresses allocation of these volumes separately in III.A.5.

Tex. Feb. 15, 2023).   In <u>MIECO</u> the parties had entered into a natural gas sale contract that includes nearly the same NAESB force majeure terms as here.   <u>Id.</u> at *5.   The only difference was that the <u>MIECO</u> parties replaced the general force majeure definition—"any cause not reasonably within the control of the party claiming suspension"—with a narrower one:   "an event or circumstance which <u>prevents one party from performing</u> its obligations . . . which is not within the reasonable control of . . . the claiming party, and which, by the exercise of due diligence, the claiming party is unable to overcome or avoid or cause to be avoided."   <u>Id.</u> (emphasis added).   The contract also did not include Special Conditions 2 or 3 at issue here.   <u>Id.</u>   The parties kept the § 11.2 list of specific force majeure events, including "weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe."   <u>Id.</u>   When Uri hit and reduced gas production in the Permian Basin, the seller declared force majeure and delivered less gas.   <u>Id.</u> at *2.   The buyer argued that the seller could only declare force majeure when performance was impossible, because a qualifying event must "prevent" performance. <u>Id.</u> at *6.   And because it was not impossible to buy and deliver replacement gas, the buyer argued, Uri was not a force majeure event.   <u>Id.</u>   The <u>MIECO</u> court rejected this argument because (1) one definition of prevent is "to render [an action] <u>impractical</u> or impossible by anticipatory action," (2) requiring impossibility

-20-

would "render portions of the Force Majeure Section superfluous," and (3) the buyer's reading would "make the force majeure provision essentially duplicative of the common law defense of impossibility." Id. (emphasis in original).

Although MIECO's reasoning pertained to a different force majeure definition, Plaintiff's argument similarly requires reading "prevented or restricted" to require impossibility.[62]   The court agrees with the MIECO court that "prevent," as used in this context, does not require impossibility.   In particular, the court is persuaded that this reading would make several parts of the Contracts' force majeure provision superfluous.   For example, § 11.1 defines Force Majeure as an event "not reasonably within the [declaring party's] control"; § 11.2 requires the parties to make "reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event"; and § 11.3 prohibits force majeure declarations when "the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch" (emphasis added).   Under Plaintiff's reading, the requirements of "reasonable efforts" and "reasonable dispatch" would be superfluous. Any possible action to remedy the force majeure and resume full delivery would be required, whether or not it was "reasonable."

_____

[62] Id. at 26 ("[T]he operative question for Special Condition No. 3 is whether Chevron was able to deliver Gas, as defined in the Base Contract, at the Delivery Point.").

ii.  Practicability of Purchasing Replacement Gas

Having concluded that Special Condition 3 hinges on practicability instead of possibility, the court considers whether there is a genuine dispute of material fact on the practicability of delivering more gas during Uri.  Plaintiff does not point to some other gas field from which Defendant could deliver gas to Katy Oasis.  Plaintiff instead argues that Defendant could have obtained gas by purchasing it on the Katy Oasis spot market.  For all but the last three days of missed deliveries, the cost of supplying gas from the spot market was totally disproportionate to the contract price.  The reference spot price on February 14, 2021, was $149.045 per MMbtu, more than a 5,200 percent increase over the contract price.[63]  This increased to $359.14 per MMbtu on February 17, nearly 12,800 percent above the contract price, before falling to $64.32 per MMbtu by February 19, which was 2,200 percent above the contract price.[64]  The average spot prices fell to $4.68 per MMbtu for the last three days of missed deliveries, 68 percent above the contract price.[65]  The Contracts explicitly list "low temperatures which cause freezing or failures of wells" as a force majeure.  If the existence of a spot market precluded force majeure, a well-

---

[63]Exhibit 8, Docket Entry No. 42-9, p. 2 (Katy GD Platts Price).

[64]Id.

[65]Id.

-22-

freezing storm would never qualify unless all suppliers lost virtually all of their production feeding the Oasis pipeline.[66]  In fact this would likely render Special Condition 2 superfluous, because an event affecting only a single gas-producing region or wellhead almost certainly could not exhaust the entire Katy Oasis spot market.   At least as to February 14-19 (when spot market prices were totally disproportionate to the contract price), the court concludes Uri was unambiguously a "Force Majeure" and that it "prevented or restricted" delivery, notwithstanding the availability of some spot market gas.

Even if the contract were ambiguous regarding the obligation to purchase replacement gas, this ambiguity would be removed by

---

[66]Plaintiff's reading implies an absurd outcome during severe production losses.  When there is not enough gas for all suppliers to meet their term deliveries, it becomes impossible for all of them to perform.   But because they can purchase gas on the spot market, full performance by any single supplier remains technically possible.   Therefore none of the suppliers could declare force majeure, even though an event had made it impossible to fill all the suppliers' obligations.   Under this reading, for a loss-of-production event to completely excuse any one supplier's performance, it would have to eliminate 100% of its production feeding the Oasis Pipeline and 100% of every other supplier's production.   Multiple courts have declined to read force majeure clauses as requiring unavailability of replacement gas, stating that the force majeure clause would be effectively meaningless. See Ergon-West Virginia, Inc. v. Dynegy Marketing & Trade, 706 F.3d 419, 424 n.5 (5th Cir. 2013) (force majeure clause would be "effectively meaningless" if the seller was only "rendered unable" to perform when there was no replacement gas for sale);   Tejas Power Corp. v. Amerada Hess Corp., No. 14-98-00346-CV, 1999 WL 605550, at *3 (Tex. App.—Houston [14th Dist.] Aug. 12, 1999) ("the force majeure clause would be meaningless" if seller was required to "'overcome' the effects of the event . . . by purchasing additional gas on the 'spot' market").

Defendant's evidence of industry customs. Defendant's industry customs expert, Mr. Bob Broxson, states:

> [I]ndustry participants do not expect a natural gas supplier in Chevron's position to be under an obligation to purchase replacement gas to meet supply obligations. Indeed, one reason that the industry employs Force Majeure provisions is to avoid worsening a crisis by relieving suppliers of such an obligation to buy limited supplies of gas.[67]

The court has reviewed Mr. Broxson's background and concludes that he is competent to offer expert testimony on this issue. See Fed. R. Evid. 702.[68] In Ergon-West Virginia the Fifth Circuit also credited expert testimony that the industry does not expect sellers to purchase replacement gas. Id.[69] The court held that this

---

[67]Expert Report of Bob Broxson, Docket Entry No. 39-6, pp. 25-26 ¶ 7.4.

[68]Although Plaintiff argues that Defendant's expert reports are hearsay, Mr. Broxson's report may be considered for summary judgment because the information could be offered in an admissible form at trial. See Fed. R. Civ. P. 56(c)(2); see Patel v. Texas Tech University, 941 F.3d 743, 746-47 (5th Cir. 2019).

[69]The Ergon-West Virginia case involved two natural gas supply contracts with materially different force majeure language. 706 F.3d at 422, 425. The Fifth Circuit held that the first contract unambiguously allowed force majeure declarations regardless of the availability of replacement gas. Id. at 425. But the second contract limited force majeure events to ones "which by the exercise of due diligence [the claiming] party is unable to overcome." Id. (emphasis omitted). The court held that the second contract was ambiguous on its face as to whether the seller had to purchase replacement gas before resorting to force majeure. Id. at 426. However, the court stated that the expert testimony regarding industry customs removed the ambiguity and held that the seller had no duty to attempt to provide replacement gas. Id. The expert testimony differed from Mr. Broxson's in that the defendant was an intermediate seller, not a producer. Id. at 425. Nevertheless, (continued...)

-24-

evidence removed any contractual ambiguity on that issue. Id. The court concludes that nothing cited by Plaintiff rebuts Mr. Broxson's statement.[70] Even if the contract were ambiguous regarding the obligation to purchase replacement gas, the evidence of industry practice removes the ambiguity.[71]

Even though the spot price fell to arguably reasonable levels from February 20-22, Plaintiff declined available gas during this time period. On February 19, Defendant told Plaintiff "more production may be coming online, if we have more, can you take more?" Plaintiff did not respond to this question. On February 21 Defendant offered again, stating, "we have more production for our

---

[69] (...continued)
the court holds that Mr. Broxson's opinion, in the absence of contrary evidence, removes any ambiguity regarding the duty to purchase reasonably-priced replacement gas.

[70] Plaintiff cites the statement of Felix Guardado, one of Defendant's natural gas traders. He stated that he purchases gas on the spot market when there is not enough to cover sales. Plaintiff's Response, Docket Entry No. 42, p. 23. But this was part of questioning about Mr. Guardado's "day-to-day" management of long-term contracts. It did not pertain to his practice or obligation during a force majeure event. At best, this is a "mere scintilla" of evidence for Plaintiff, insufficient to defeat summary judgment. See Owens v. Circassia Pharmaceuticals, Inc., 33 F.4th 814, 834 (5th Cir. 2022).

[71] Defendant makes two other arguments that reinforce this conclusion. First, Defendant argues that Special Condition 3 is only concerned with Defendant's ability to "deliver" gas and that it would not be "delivering" any gas purchased at the Katy Oasis. That is, the gas would already be delivered at Katy Oasis by another supplier, and Defendant would just be allocating already-delivered gas to Plaintiff. Second, Defendant argues that Plaintiff declined available gas on February 21, the day after spot prices had returned to somewhat normal levels.

baseload markets . . . if you can take any today and tomorrow." Plaintiff responded, "[w]e are not in a position to pick up anything today."  There is contrary evidence on this point.  The court concludes that Plaintiff waived any claim for breach for these days by declining available gas.  <u>See Ramex Construction Co. v. Tamcon Services Inc.</u>, 29 S.W.3d 135, 137 (Tex. App.—Houston [14th Dist.] 2000) ("breach of contract may be waived").

### 5.   The Force Majeure Language as a Whole

In summary, the court concludes that Special Condition 2 only excludes loss-of-production events that are confined to a single gas producing region, which does not apply in this case. Defendant's reading of Special Condition 3 may be plausible when viewed in isolation.  But it becomes untenable when read together with the other force majeure language, primarily because it would make Special Condition 2 superfluous.  The court therefore also concludes that Special Condition 3 does not exclude a loss-of-production event such as Uri.  The court further concludes that Special Condition 3 does not require Defendant to purchase the available replacement gas before resorting to a force majeure declaration.  Because the Base Contract would permit Defendant's force majeure declaration, and because neither Special Condition 2 nor 3 excludes it, the Contracts' as a whole unambiguously authorize Defendant's force majeure declaration.

-26-

6.   Defendant's Allocation of Available Gas

Plaintiff argues that even if the contract permits a force majeure declaration based on loss of production, Defendant was required to allocate more gas to Plaintiff.  Plaintiff essentially argues that it should have received all of the gas that Defendant delivered to other customers.  The court is not persuaded by this argument.  Although Defendant's supply of gas at Katy Oasis exceeded its deliveries to Plaintiff, it was well short of its total obligations.  As the court in Tejas Power recognized, a supplier in such a situation is not precluded from declaring force majeure.  Tejas Power, No. 14-98-00346-CV, 1999 WL 605550, at *2. Otherwise every buyer could defeat a force majeure declaration by claiming a right to the same gas.  Absent a contractual promise of priority, the seller's obligation during a valid force majeure event is to provide a "fair and reasonable" allocation of the available gas.  Id.; see also Tex. Bus. & Com. Code Ann. § 2.615(2).  Nothing in the Contracts states or implies that Plaintiff would receive allocation priority.

Plaintiff argues that Defendant did not provide a fair and reasonable allocation, pointing to some spot trades that Defendant entered two days before it missed deliveries.[72]  Plaintiff cites no authority indicating that Defendant must affirmatively prove allocation fairness as an element of its force majeure defense.

---

[72]Defendant's Response to Plaintiff's Interrogatory No. 2, Exhibit 9 to Plaintiff's Response, Docket Entry No. 42-10, pp. 2-3.

Moreover, the relevant statute appears more consistent with presuming a fair allocation unless proven otherwise. See Tex. Bus. & Com. Code Ann. § 2.615(2) (allowing a seller declaring force majeure to "allocate in any manner which is fair and reasonable") (emphasis added)). Even if the fairness of Defendant's allocation were properly raised here, the court concludes that there is no genuine dispute of material fact. Defendant entered the challenged spot trades two days before it started missing deliveries. Plaintiff cites no evidence that Defendant knew it would soon miss deliveries. Even if it did, § 2.615 expressly allows a seller to allocate some production to "regular customers not then under contract." Id. The court concludes that Defendant does not have to affirmatively prove allocation fairness to establish its force majeure defense. Even if it was an element, the court concludes that there is no genuine dispute of material fact as to allocation fairness.

## B.    Remaining Summary Judgment Requests

Plaintiff also seeks summary judgment on Defendant's "governmental orders" and estoppel defenses.[73]  Because force majeure excused Defendant's performance, it is not necessary to determine whether Plaintiff should be estopped from asserting its interpretation since it knew Defendant held a contrary interpretation during contract negotiations or to determine whether Texas

---

[73]Plaintiff's MSJ, Docket Entry No. 37, pp. 19, 23.

government emergency orders prevented Defendant's performance.   In light of the court's conclusion that Defendant could declare force majeure even if there was replacement gas available for purchase, the court also need not determine whether the government orders prevented Defendant from purchasing that replacement gas. Plaintiff also seeks summary judgment on three affirmative defenses that Defendant abandons:   impossibility or impracticability, failure to mitigate, and unconscionability.[74]   These defenses are moot both because the court concludes the force majeure declaration was valid and because Defendant has abandoned them.

## IV.   Conclusion and Order

The court concludes that Defendant's force majeure declaration was unambiguously permitted by the Contracts.   Plaintiff Cailip Gas Marketing, LLC's Traditional Motion for Summary Judgment (Docket Entry No. 37) is **DENIED**, and Chevron Natural Gas's Motion for Summary Judgment (Docket Entry No. 39) is **GRANTED**.

**SIGNED** at Houston, Texas, on this 12th day of April, 2023.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

---

[74]Id. at 24-27; Defendant's Response, Docket Entry No. 41, p. 29.

-29-